UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
A.D. and M.D., individually and on      :
behalf of E.D.,                         :
              Plaintiffs,               :
                                        :
        -v-                             :    08 Civ. 9424 (DLC)
                                        :
THE BOARD OF EDUCATION OF THE CITY      :
SCHOOL DISTRICT OF THE CITY OF NEW      :    OPINION & ORDER
YORK, a/k/a and d/b/a, THE NEW YORK     :    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
CITY DEPARTMENT OF EDUCATION and JOEL   :
KLEIN, in his official capacity as the  :
Chancellor of the City School District  :
of the City of New York,                :
              Defendants.               :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs:
Steven L. Goldstein
111 John Street, Suite 800
New York, NY 10038

For Defendants:
Lesley Berson
New York City Law Department
100 Church Street, Room 2-306
New York, NY 10007

DENISE COTE, District Judge:

        Plaintiffs A.D. and M.D., on behalf of their minor child

E.D., bring this action pursuant to the Individuals with

Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. (the

"IDEA").  Plaintiffs seek review of the August 13, 2008

administrative decision of State Review Officer Paul F. Kelly

(the "SRO") annulling the May 19, 2008 decision of Impartial

Hearing Officer Barbara J. Ebenstein (the "IHO") and vacating the IHO's award of tuition payment and reimbursement for E.D.'s attendance at the Rebecca School between July 2007 and August 2008.  Plaintiffs move for summary judgment, seeking an order reversing the SRO's decision in part and reinstating the IHO's award of tuition payment and reimbursement.  Defendants cross-move for summary judgment, seeking an order upholding the SRO's decision and dismissing plaintiffs' complaint.  Defendants also move to strike certain additional materials submitted by plaintiffs pursuant to Rule 56(e)(1).

Because the defendants do not contest the SRO's finding that they failed to offer E.D. an appropriate education as required by the IDEA, the principal issue in dispute is whether the SRO erred in concluding that Rebecca was not an appropriate unilateral placement for E.D.  For the reasons set forth below, plaintiffs' and defendants' motions for summary judgment are each granted in part; defendants' motion to strike is granted; and defendants are ordered to provide tuition payment and reimbursement for E.D.'s attendance at the Rebecca School during the 2007-08 statutory school year.

STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A) & (B); see also Forest Grove Sch. Dist. v. T.A., __ U.S. __, 129 S. Ct. 2484, 2491-92 (2009) ("Forest Grove") (discussing the purposes of the IDEA); Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 523 (2007) (same).  States receiving federal funding under the IDEA are required to make a free appropriate public education ("FAPE") available to all children with disabilities residing in the state.  20 U.S.C. § 1412(a)(1)(A).  To this end, IDEA requires that public schools create for each student covered by the Act an individualized education program ("IEP") for the student's education at least annually.  20 U.S.C. § 1414(d)(2)(A); see also Honig v. Doe, 484 U.S. 305, 311 (1988) ("[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."); D.D. ex rel. V.D. v. N.Y. City Bd. of Educ., 465 F.3d 503, 507 (2d Cir. 2006) (describing

the IEP as "[t]he centerpiece of the IDEA's educational delivery system" (citation omitted)).

In New York City, the City Department of Education ("DOE") is charged with providing a FAPE to all students with disabilities between the ages of 3 and 21 who reside in the City, and to develop the IEP for these students by convening local Committees on Special Education ("CSEs").  N.Y. Educ. L. § 4402.  "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107-08 (2d Cir. 2007).  The IEP must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits."  Id. at 107 (citation omitted). "A school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (citation omitted).

The IDEA requires that parents be provided an opportunity to present a complaint with respect to the identification,

evaluation, or placement of their child through the IEP process. 20 U.S.C. § 1415(b)(6)(A).  Where the parents believe that the school district has not adequately responded to their complaints, the IDEA requires that they be given an opportunity to pursue their grievances through an "impartial due process hearing."  Id. § 1415(f)(1)(A).  In New York, these hearings are conducted by an Impartial Hearing Officer (the "IHO"), and parties aggrieved by the IHO's decision may appeal to the State Review Officer (the "SRO").  See N.Y. Educ. L. § 4404; 20 U.S.C. § 1415(g)(1) (permitting "any party aggrieved by the findings and decision rendered [by the hearing officer] [to] appeal such findings and decision to the State educational agency").  The IDEA further provides that the final administrative decision may be reviewed "in a district court of the United States" by "bring[ing] a civil action with respect to the complaint."  20 U.S.C. § 1415(i)(2)(A).  The district court is empowered to "receive the records of the administrative proceedings," to "hear additional evidence," and to "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it.  Id. § 1415(i)(2)(C); see also Forest Grove, 129 S. Ct. at 2492 (noting that the IDEA "gives courts broad authority to grant 'appropriate' relief").  The IDEA specifically contemplates that "when a public school fails to provide a FAPE and a child's parents place the child in an

appropriate private school without the school district's
consent, a court may require the district to reimburse the
parents for the cost of the private education." Forest Grove,
129 S. Ct. at 2488; see 20 U.S.C. § 1412(a)(10)(C).

FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule
56.1 statements, as supported by the administrative record, and
are undisputed unless otherwise indicated.[1]

I.   The Plaintiffs

Plaintiffs A.D. and M.D. are the father and mother of E.D.
A.D. and M.D. are originally from the Dominican Republic and
moved to New York in 1988.  M.D. speaks only Spanish.

E.D. was born on October 27, 1995, and has resided in New
York since birth.  E.D. is classified as a student with autism
and is thus a "child with a disability" under the IDEA.  See 20
U.S.C. § 1401(3)(A)(i).  Until 2006, E.D. attended first through
fifth grades at Public School 48 ("P.S. 48").  During her time

_____

[1] Local Rule 56.1 requires that any motion for summary judgment
be accompanied by a list of the "material facts as to which the
moving party contends there is no genuine issue to be tried."
L. Civ. R. 56.1(a).  In IDEA cases, however, Rule 56.1
statements are not strictly required; "while a Rule 56.1
statement may assist the court in reviewing particular issues,
it is not in and of itself dispositive." T.Y. & K.Y. ex rel.
T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 418 (2d Cir.
2009) ("T.Y.").

at P.S. 48, E.D. had tantrums and engaged in self-injurious behaviors.  E.D. shows "significant deficits" with respect to "expressive language, receptive language, fine motor, sensory processing, auditory processing, reading (decoding and comprehension), transition, gross motor, and writing skills." According to a DOE representative, E.D. is in the "moderately deficient range" of "overall cognitive functioning," and E.D. suffers from "difficulty interacting socially with peers" and difficulty with "communicat[ing]" and "regulat[ing] her feelings."  E.D. speaks English at school, and at home mostly speaks Spanish.

## II.  The 2006-07 School Year

### A.   The Rebecca School

In September 2006, E.D. began attending the Rebecca School ("Rebecca"), a private day school in Manhattan for students with neurodevelopmental disorders, including autism.  The Rebecca School first opened in September 2006 and is not approved by the New York Commissioner of Education as a private school with which school districts may contract to instruct students with disabilities.  See 8 N.Y. Comp. Codes R. & Regs. § 200.7.  As of February 2008, Rebecca had 85 students ranging in age from four to sixteen; a typical class at Rebecca includes eight students, one teacher, and three teacher assistants.

Rebecca's curriculum is based on the Developmental Individual-difference Relationship-based ("DIR") model pioneered by Dr. Stanley Greenspan, who is a consultant to the school, and Dr. Serena Wieder.  As described by defendants, the DIR model "identifies nine developmental levels, which are as follows: 1) regulation, 2) shared attention, 3) back and forth communication, 4) shared social problem-solving, 5) symbolic thinking, 6) building logical bridges between ideas, 7) multi-causal thinking, 8) grey area thinking, and 9) self-reflective thinking."[2]  DIR is a developmentally oriented methodology for working with autistic children, in contrast with behaviorally oriented methodologies such as applied behavioral analysis ("ABA").  According to Rebecca, DIR "proceeds from the core belief that relationships are the foundation of learning."  "DIR considers each child's functional emotional developmental level, how the child processes information and the learning relationships that enable him or her to progress."  In accordance with the DIR model, students at Rebecca are assigned to classes based on their age, verbal ability, sensory needs, academic abilities, and "functional emotional developmental

---

[2] A student is said to be "at" the DIR level equal to the highest-order function that he or she has achieved on the nine-level developmental ladder.  A typical child achieves all nine DIR levels by age six or seven, but children on the autistic spectrum "often do not master these levels either at the same age that typical children do or . . . not as fully."

level," and within each class, the educational and therapeutic program is individually "tailor[ed] . . . to each child's needs," i.e., to the "individual differences" of each student. A cornerstone of the DIR method is "Floortime," an educational technique centered around playful one-on-one interactions between students and staff members while engaged in an activity of the student's choice, by which staff aim to "meet the child at their developmental level and then to move them ahead."

With respect to the 2006-07 school year, A.D. and M.D. commenced a due process proceeding against the DOE seeking reimbursement for tuition paid to Rebecca and prospective payment of amounts still owed.  The plaintiffs and the DOE subsequently entered into a settlement agreement whereby the DOE paid for E.D.'s attendance at Rebecca during the 2006-07 school year.

B.   Formal and Informal Assessments During the School Year

Rebecca conducted various assessments of E.D. during the 2006-07 school year to track E.D.'s educational and therapeutic progress and set curricular goals.  These assessments were relied upon by the CSE in formulating E.D.'s IEP for the 2007-08 school year.  Because the accuracy and sufficiency of these assessments have been challenged by both plaintiffs and defendants at various stages of the proceedings, insofar as the

assessments relate to the appropriateness of the IEP and of Rebecca, they will be considered here in some detail.

First, on August 31, 2006, Rebecca conducted an emotional evaluation of E.D. using the Functional Emotional Assessment Scale (the "FEAS").  The FEAS was created by Dr. Greenspan and is standardized against three- and four-year-old non-disabled children, but is used by Rebecca for students with neurodevelopmental disorders of various ages.  The FEAS is conducted by a psychologist who observes the child's behavior while the child interacts with his or her "caregiver," usually a parent.  Rebecca performs the FEAS once each year.  The August 31, 2006 FEAS revealed that E.D.'s emotional development was deficient in each of six categories tested.  The FEAS also determined that M.D.'s caregiver abilities were deficient in all areas with the exception of "self-regulation and interest in the world," which was credited as normal.

Second, a series of progress reports were produced in November 2006.  A Speech-Language Therapy Progress Report was written by Jennifer Bailey on or about November 14, 2006 (the "November Speech Report").  The November Speech Report is a two-page document containing specific observations, pedagogical updates, and conclusions with respect to E.D.'s skills and deficits in four areas: "receptive language," "expressive language," "pragmatics," and "oral motor/articulation."  For

10

example, with respect to E.D.'s receptive language abilities, the November Speech Report concluded that E.D. "appears to have an adequate receptive vocabulary for common nouns and verbs, but her comprehension of spatial and descriptive concepts is significantly limited." The November Speech Report also stated that E.D. "seem[s] to display a moderately severe auditory processing delay characterized by increased response time for questions and directions." The November Speech Report cautioned, however, that "[E.D.]'s receptive language is somewhat difficult to assess due to the fact that [she] is bilingual and has limited expressive output" and that "it is difficult to determine whether [E.D.'s auditory processing delay] is because of an inherent processing disorder or because English is not her first language." The November Speech Report concluded by setting twelve specific goals for E.D. across three categories -- receptive language, expressive language, and pragmatic skills.[3]

The same day, November 14, E.D.'s classroom teacher Alex Klein produced a four-page progress report (the "November Teacher Report"). The November Teacher Report stated that "[E.D.] is a very happy and energetic child who has come a long

_____

[3] For example, one of the four goals in the "pragmatic skills" area was that E.D. "will have an interactive conversation where she combines 2-4 words at a time to talk on the same topic for 3-4 exchanges, at least three times per day."

way in the last seven weeks since she first starting [sic]
coming to the Rebecca School in September 2006." Klein
observed, inter alia, that E.D. is "hyper-sensitive to sound"
and that "[t]ransitions into and out of certain activities can
be hard for [her]." After making general observations
concerning E.D.'s interests, therapeutic needs, and classroom
demeanor, the November Teacher Report described E.D.'s progress
with respect to each of the first four developmental levels
within the DIR framework.

    Also in November 2006, Melissa Frey prepared a one-page
Occupational Therapy Progress Report (the "November OT Report").
The November OT Report noted that E.D. is "hyper sensitive to
auditory, tactile and visual input"; is "easily distracted";
frequently "becomes deregulated"; and has difficulty "engaging
and relating" with others. At that time, E.D. was receiving
occupational therapy twice each week for thirty minutes each
session. The November OT Report set three long-term goals, each
of which contained two or three sub-goals.

    Third, a Confidential Psychological Report was written on
or about December 18, 2006 by Coral Ballister in conjunction
with Melissa Frey and Jennifer Bailey (the "Psychological
Report"). The eight-page Psychological Report -- carried out
"as part of the standard assessment procedure for students
enrolled at the Rebecca School" -- was "conducted to establish a

baseline level of cognitive and behavioral development, as well as to more thoroughly assess [E.D.'s] individual sensory system functioning." The Psychological Report was based upon a battery of various tests conducted on November 2, November 17, and December 8, 2006, including a Wechsler Intelligence Scale for Children—Fourth Edition assessment (the "WISC-IV"); a Vineland Adaptive Behavior Scales—Second Edition assessment ("Vineland-II"); a "sensory profile"; a Temperament and Atypical Behavior Scale ("TABS") test; and a Comprehensive Assessment of Spoken Language ("CASL") test. The Psychological Report stated that E.D. "presented as a curious and playful child who was easily distracted and had difficult[y] sustaining attention throughout the assessment." The Report noted that "[t]esting took place over three sessions in an attempt to maximize her ability to perform at her best," but that "[s]everal attempts at testing were discontinued because of marked interference in her ability to attend to testing that appeared to be due to pain, discomfort, and/or sensory dysregulation." In addition, "[E.D.'s] speech was also difficult to understand at times, and it was difficult to tell sometimes whether she was speaking in English or Spanish," even with the translation assistance of E.D.'s Spanish-speaking teacher assistant. Ballister, who interpreted the WISC-IV results, cautioned that due to E.D.'s bilingualism, Spanish dominance, and autism, the results of the

WISC-IV "should be interpreted with extreme caution and should only be used as estimates of her current level of functioning" rather than as an "authoritative appraisal of her actual cognitive abilities."[4]  Ballister also concluded that, owing to E.D.'s "bilingual status and uneven language development . . . a bilingual evaluation may be more appropriate for assessing her language and verbal development."  Ballister suggested, moreover, that "[a] nonverbal test of cognitive functioning may provide a more accurate assessment of [E.D.'s] true cognitive abilities."  With respect to the Vineland-II test of personal and social self-sufficiency, E.D.'s test results put her at the first percentile, but Ballister cautioned that the test (which included an evaluation form completed by M.D.) contained certain inconsistencies, probably owing to M.D.'s misunderstanding of the test.[5]

Fourth, on January 25, 2007, Jennifer Bailey conducted an "initial speech and language evaluation" of E.D., which despite the recommendations of the earlier reports was conducted in English only.  The results were detailed in a three-page report (the "January Speech Report").  The January Speech Report noted

_____

[4] The "estimate[d]" full-scale intelligence quotient as determined by the WISC-IV was 41, which is below the first percentile.

[5] For example, M.D. ticked boxes indicating that E.D. usually "[m]akes appointments for regular medical and dental checkups" and "[u]ses savings or checking account responsibly."

that formal testing (including a CASL assessment) could not be completed because E.D. could not focus on the test, even though it was conducted in the sensory gym, "where [E.D.] tends to be most regulated and attentive."  The January Speech Report therefore reflected only Bailey's "informal assessment and clinical observation" with respect to the same four categories that were described in the November Speech Report, namely, receptive language, expressive language, pragmatic skills, and articulation/oral motor.  Bailey's observations in the January Speech Report reached the same general conclusions, at times using identical words, as did the November Speech Report.

Fifth, on March 1, 2007, Victoria A. Ritvo completed an Occupational Therapy Progress Report (the "March OT Report"). The two-page March OT Report reflected Ritvo's "professional opinions and informal evaluation . . . over the past two weeks," and described E.D. as "a child who displays with sensory processing and modulation issues."  E.D. craves "light touch" and "is easily distracted by external stimuli (visual and auditory) and becomes over stimulated in noisy environments." The March OT Report recommended that E.D. "continue to receive occupational therapy services on a 1:1 basis at least three times per week" and identified three general therapeutic goals.

On March 9, 2007, Bailey filed another Speech-Language Therapy Progress Report (the "March Speech Report").  The March

Speech Report noted that E.D. was receiving speech-language therapy four times per week on a one-to-one basis.  The March Speech Report stated that E.D. was continuing to work on the developmental levels of "shared attention and regulation," "engagement and relating," "purposeful two-way communication," and "shared problem-solving."  After making observations about E.D.'s abilities with respect to the four categories of receptive language, expressive language, pragmatic skills, and oral motor/articulation, the Report concluded that "it is difficult to ascertain if her difficulty in following directions independently is due to a language processing deficit or a lack of compliance; it is likely a combination of both factors."  The Report then identified twelve specific goals for E.D. across the three areas of receptive language, expressive language, and pragmatic skills.

Finally, on March 13, a Teacher Progress Report was prepared by E.D.'s teacher, Alex Klein (the "March Teacher Report").  Klein stated that E.D. was "fluctuat[ing] between levels 1-3" on the DIR scale and had showed "islands of ability" at levels 4 and 5 with the help of a teacher or therapist.  The March Teacher Report concluded that the "challenges [E.D.] has in mastering levels 1-5 are a result of her difficulty with self-regulation."  The March Teacher Report went on to establish five specific developmental goals for E.D.

III. Planning for the 2007-08 School Year

On March 5, 2007, E.D.'s CSE convened an annual review
meeting to develop a plan for E.D.'s education during the
upcoming 2007-08 school year.  Various reports produced by
Rebecca were considered by the CSE, including the November and
January Reports; the November Teacher Report; the Psychological
Report; the November OT Report; and a school observation report
conducted by Towanna Soto, a DOE special education teacher.[6]  The
CSE considered and rejected a private school placement for E.D.
for 2007-08, concluding that E.D. "can meet her IEP goals in a
less restrictive setting at this time."  At the CSE meeting,
E.D.'s parents expressed disagreement with defendants'
recommendations, and in particular, M.D. made clear that she
wished for E.D. to remain at Rebecca, noting that she was making
progress there.

As a result of the meeting, the DOE produced an IEP that
proposed placing E.D. in District 75, New York City's district
of full-time special education schools, for the 2007-08 school
year.  Within the District 75 program, E.D. would be placed in a
specialized class with a student-to-teacher-to-paraprofessional
ratio of 6:1:1.  The IEP provided for individual occupational

---

[6] It is not apparent from the record whether the CSE considered
any of the March reports in formulating E.D.'s IEP.  Two of
these reports -- the March Speech Report and the March Teacher
Report -- post-date the CSE meeting.

therapy in three sessions per week for 30 minutes; individual speech and language therapy in two sessions per week for 30 minutes; and group speech and language therapy once per week for 30 minutes in a group size of two.  The IEP discontinued E.D.'s crisis paraprofessional.  The IEP also placed E.D. in a general-education physical education class rather than an adaptive physical education class.

About three months later, by Final Notice of Recommendation dated June 4, 2007 (the "FNR"), defendants informed plaintiffs of the school -- Public School 94 at Public School 196 ("P.S. 94") -- in which E.D.'s recommended program would be implemented.  The letter stated that if the DOE did not hear from the plaintiffs by July 6, 2007, "the recommended changes will be put into effect."  Thereafter, A.D. and M.D. went to visit the proposed placement at P.S. 94.  They concluded that the P.S. 94 placement was not appropriate for E.D., and consequently, they decided to unilaterally place E.D. at Rebecca for the 2007-08 school year.

On June 18, 2007, plaintiffs filed a request for an impartial due process hearing pursuant to 20 U.S.C. § 1415(b)(6) and N.Y. Educ. L. § 4404(1)(a), claiming that the defendants failed to offer E.D. a FAPE.  The complaint sought prospective tuition payment for E.D.'s attendance at Rebecca between July 2007 and August 2008.  The plaintiffs withdrew their June 18

complaint, however, upon notification from the DOE that plaintiffs' reimbursement claim would be submitted for settlement.

Thereafter, no settlement was reached.  The plaintiffs filed a new, substantially similar request for an impartial due process hearing on November 5, 2007.  In the renewed request, plaintiffs alleged, among other things, that defendants had based their IEP for E.D. for the 2007-08 school year on unreliable and insufficient "subjective estimates" rather than "objective information."  The plaintiffs also alleged that the parents' unilateral placement of E.D. at the Rebecca School was appropriate because it "address[ed] her educational needs" and "allow[ed] her to make meaningful educational progress."

## IV.  Proceedings Before the IHO

An impartial hearing was thereafter conducted before IHO Barbara J. Ebenstein in three sessions on February 12, March 19, and March 28, 2008.  At the hearing, defendants presented the testimony of three witnesses -- the DOE representative on the March 5, 2007 CSE, Beth Shatzkin ("Shatzkin"); a DOE Placement Officer, Martin Bassis; and an Assistant Principal from P.S. 94, Susan Cruz.  The plaintiffs presented testimony from Rebecca's Program Director, Tina McCourt ("McCourt"); E.D.'s classroom

teacher at Rebecca, Amanda Friedman ("Friedman"); a Rebecca

social worker, Sherry Levine ("Levine"); and A.D. and M.D.

The IHO rendered her Findings of Fact and Decision on May

19, 2008.  The IHO found that the DOE had failed to offer E.D. a

FAPE for the 2007-08 school year.  In particular, the IHO found

that the March 5, 2007 IEP developed for E.D. had

> fail[ed] to offer [a] research based methodology,
> fail[ed] to comply with the Part 200.13 regulations,
> fail[ed] to provide APE [adaptive physical education],
> fail[ed] to provide related services without the
> parents finding those services themselves using a RSA,
> and fail[ed] to have 'high expectations' to prepare
> [E.D.] to lead a productive and independent adult life
> to the maximum extent possible for her.[7]

Second, the IHO concluded that the unilateral placement of E.D.

at Rebecca had been appropriate.  Third, the IHO found that

equitable considerations supported the plaintiffs' claim for

tuition reimbursement; not only had plaintiffs "fully cooperated

with the Department of Education," but the DOE had "[un]clean

hands" and had "exhibited bad faith in its assertion that they

---

[7] In reaching this decision, the IHO concluded that the standard
set forth in Board of Education v. Rowley, 458 U.S. 176, 207
(1982) -- that the IEP be "reasonably calculated to enable the
child to receive educational benefits" -- did not apply because
defendants recommended placing E.D. in a full-time special
education classroom.  The IHO relied instead on Deal v. Hamilton
Board of Education, 392 F.3d 840 (6th Cir. 2004), which held
that an IEP for a student who is not placed in a regular-
education classroom should aim to "provid[e] a meaningful
educational benefit towards the goal of self-sufficiency."  Id.
at 864.

would settle this matter and then failure [sic] to do so for three months."

As a result, the IHO ordered the DOE to pay E.D.'s tuition at Rebecca for the September 2007-June 2008 school year as well as for July and August 2007 and July and August 2008, a fourteen-month period in total.  While acknowledging that this fourteen-month period exceeded the twelve-month statutory school year as defined by New York Education Law § 2(15), the IHO reasoned that the award was justified because once the parents decided to unilaterally commit to a private school, the parents had to observe the school year as defined by the private school rather than as defined by the defendants.

## V.   Proceedings Before the SRO

Following the IHO's decision, the defendants appealed to the SRO, as permitted by 20 U.S.C. § 1415(g)(1)(A) and N.Y. Educ. L. § 4404(2).  SRO Kelly issued his decision on August 13, 2008.  See Application of the Dep't of Educ., Appeal No. 08-056 (Aug. 13, 2008).  The SRO agreed that the defendants had failed to offer E.D. a FAPE, but relied upon different grounds than the IHO.[8]  The SRO then held, reversing the IHO, that the plaintiffs

---

[8] In particular, the SRO concluded that the Rowley standard did apply, and also concluded that the IHO had exceeded her jurisdiction by basing her decision on issues that the IHO "raised sua sponte at the impartial hearing" and that had not

had not carried their burden of proving that Rebecca's program
for E.D. was "appropriate" and, therefore, were not entitled to
tuition reimbursement.  Nevertheless, the SRO directed the DOE
to conduct certain evaluations of the student within 30 days of
the SRO's decision, including a non-verbal test of E.D.'s
cognitive functioning, a bilingual speech-language evaluation,
and an assessment of E.D.'s academic functioning, unless such
evaluations had already been conducted within the past year.[9]


PROCEDURAL HISTORY

On November 1, 2008, the plaintiffs timely filed a
complaint seeking review of the SRO's decision, as authorized by
20 U.S.C. § 1415(i)(2)(A) and N.Y. Educ. L. § 4404(3)(a).  On
July 21, 2009, plaintiffs filed their motion for summary
judgment, and on August 14, 2009, defendants filed their cross-
motion for summary judgment.  Plaintiffs' and defendants'
motions became fully submitted on October 2 and on October 30,
2009, respectively.

---

been identified in plaintiffs' November 5 due process hearing
request.

[9] These evaluations were not conducted until May 2009.

DISCUSSION

I.   Standard of Review

Although the parties have styled their submissions as motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment." Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation omitted).  As such, summary judgment in IDEA cases "often triggers more than an inquiry into possible disputed issues of fact." Id.  Rather, the court conducts an "independent" review of the administrative record, basing its decision on the "preponderance of the evidence." Rowley, 458 U.S. at 205 (citation omitted).  Summary judgment thereby "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA." Lillbask, 397 F.3d at 83 n.3 (citation omitted).

Nevertheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," T.Y., 584 F.3d at 417 (citation omitted), and "courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" Id. (quoting Rowley, 458 U.S. at 206).  "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and

experience necessary to resolve persistent and difficult
questions of educational policy." Id. (citation omitted).  "The
deference paid to administrative proceedings is particularly
warranted where . . . the district court's decision [is] based
solely on the administrative record." A.C. & M.C. ex rel. M.C.
v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009) ("A.C.").  The
court should "defer to the final decision of the state
authorities, even where the reviewing authority disagrees with
the hearing officer." Id. (citation omitted).  In cases where
"the SRO's decision conflicts with the earlier decision of the
IHO, the IHO's decision may be afforded diminished weight." Id.
(citation omitted).

## II.  Tuition Reimbursement

When a state receiving federal funding for special
education fails to give a disabled child a FAPE under the IDEA,
the child's parents or guardians may unilaterally place the
child in an appropriate private school and seek tuition
reimbursement from the state. See Sch. Comm. of Burlington,
Mass. v. Dep't of Educ., 471 U.S. 359, 369-70 (1985)
("Burlington"); Florence County Sch. Dist. Four v. Carter ex
rel. Carter, 510 U.S. 7, 12 (1993) ("Carter").  Under the
Burlington-Carter test for tuition reimbursement, plaintiffs are
entitled to reimbursement of private school tuition if (1) the

IEP was not "reasonably calculated to enable the child to receive educational benefits," (2) "the private schooling obtained by the parents is appropriate to the child's needs," and (3) equitable considerations support the plaintiffs' claim. T.Y., 584 F.3d at 417 (citation omitted); see also Forest Grove, 129 S. Ct. at 2496 ("Parents are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act . . . . [a]nd even then courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant . . . ." (citation omitted)).

A.   Appropriateness of the Unilateral Placement

On appeal, neither party contests the SRO's finding that the defendants failed to offer E.D. a FAPE.  Therefore, the first prong of the Burlington-Carter test is resolved in favor of the parents.

The second prong -- whether the parents' unilateral placement of E.D. at the Rebecca School was appropriate -- is disputed by the parties.  Under New York law, the burden of proof falls upon the parents to show that their unilateral placement at a private school was appropriate.  See Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 58 (2005) (concluding that "the burden of persuasion lies where it usually falls, upon the

party seeking relief"); N.Y. Educ. L. § 4404(1)(c) (placing the burdens of production and persuasion as to the appropriateness of a unilateral placement on the parents).  Thus, New York parents who believe that the state has failed to offer a FAPE act "at their own financial risk" when they choose to enroll their child in a private school.  A.C., 553 F.3d at 171 (citation omitted).

The standards for determining whether a private school placement is "appropriate" under the IDEA closely resemble, but do not mirror, the standards for assessing the adequacy and appropriateness of the proposed public placement.  The Second Circuit has explained that "[s]ubject to certain limited exceptions, the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents' placement."  Gagliardo, 489 F.3d at 112 (citation omitted).  "The issue turns on whether a placement -- public or private -- is reasonably calculated to enable the child to receive educational benefits."  Id. (citation omitted).  "A private placement meeting this standard is one that is likely to produce progress, not regression."  Id. (citation omitted).  "Nevertheless, parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education," and

"[a]n appropriate private placement need not meet state education standards or requirements." Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006) (citing Carter, 510 U.S. at 14). Moreover, "a private placement need not provide certified special education teachers or an IEP for the disabled student," and "parents may not be subject to the same mainstreaming requirements as a school board." Id. (citation omitted). "[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect." Id. (citation omitted). Ultimately, the standard to be applied is to determine whether "[the] unilateral private placement . . . provides education instruction specifically designed to meet the unique needs of a handicapped child." Gagliardo, 489 F.3d at 115 (citation omitted).[10]

---

[10] The court further stated in Gagliardo, with respect to determining the appropriateness of a unilateral private placement:

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides

Applying these principles, the preponderance of the evidence in the record supports a finding that Rebecca was an appropriate placement for E.D.  The record shows that Rebecca "provide[d] education instruction specifically designed to meet the unique needs" of the student.  Gagliardo, 489 F.3d at 115 (citation omitted).  The testimony and evidence offered by the plaintiffs at the due process hearing demonstrate that Rebecca provided an education that was attuned to E.D.'s particular strengths, deficits, and abilities with respect to both her academic and therapeutic needs.  The regularly conducted individualized assessments show a clear awareness of E.D.'s day-to-day and long-term educational needs, with curricular goals regularly adjusted in light of E.D.'s performance at the school.[11]

In reaching this conclusion, the Court is mindful of its responsibility to "give due weight to the administrative proceedings," and in particular, to lend deference to the

---

educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

Gagliardo, 489 F.3d at 112 (quoting Frank G., 459 F.3d at 364-65) (emphasis added).

[11] Rebecca's particular pedagogical mission is to serve students with neurodevelopmental disorders, including those on the autism spectrum, and is founded upon a philosophy that the curriculum cannot be "'one-size-fits-all,'" but rather, must be individually tailored to "fit the program to the child."

conclusions of the SRO as the final decisionmaker.  T.Y., 584
F.3d at 417.  Nevertheless, it is apparent that the SRO did not
properly analyze the evidence in the record.  Although the SRO
does not explicitly identify which pieces of evidence were
relied upon in concluding that Rebecca was an inappropriate
placement for E.D., the SRO made several evidentiary
observations that apparently influenced his decision.  These
observations fall into two general categories: the insufficiency
of the formal and informal assessments of E.D. conducted by
Rebecca, and the lack of detail concerning E.D.'s academic
curriculum while at Rebecca.

          1.   Testing

     With respect to Rebecca's assessments of E.D.'s educational
abilities and therapeutic needs, the SRO discerned various
deficiencies.  First, the SRO observed that, after "conduct[ing]
the psychological testing in November and December 2006 in which
the evaluator opined that a bilingual language evaluation might
be more appropriate for assessing the student's language and
verbal development," Rebecca apparently failed to carry out such
a bilingual evaluation.  Second, and similarly, the SRO observed
that Rebecca evaluators had concluded that "a non-verbal test of
cognitive functioning might provide a more accurate assessment
of the student's true cognitive abilities," but there was no

record of Rebecca carrying out such testing.  Third, the SRO
questioned the validity of the FEAS tests administered on E.D.
at Rebecca in August 2006 and August 2007, noting that "[i]t is
not clear that the FEAS is an appropriate instrument for
assessing this student's skills as the scale is reportedly
standardized on three and four year old children."  Fourth, the
SRO took note of an inconsistency in the testimony in the
administrative record whereby "the Rebecca School program
director [McCourt] and classroom teacher [Friedman] provided
differing estimates of the student's functional emotional
level."  The SRO summarized that "[w]hile the parents assert
that the March 5, 2007 IEP is based upon unreliable information
in that the March 2007 CSE relied upon teacher estimates, which
were subjective at best, I find that the Rebecca School program
suffers from the same defect."

Inasmuch as the SRO relied upon these considerations as a
reason for denying tuition reimbursement to the plaintiffs,
however, the SRO has confused the requirements of the first and
second prongs of the Burlington-Carter test.  If the reports and
assessments produced by Rebecca and relied upon by the CSE were
not sufficiently accurate or complete for the purposes of
designing E.D.'s IEP, the responsibility for such deficiency
lies with the defendants, not with the plaintiffs.  See 20
U.S.C. § 1414(b)(2)(A) ("[T]he local educational agency shall

use a variety of assessment tools and strategies to gather
relevant functional, developmental, and academic information . .
. that may assist in determining . . . the content of the
child's individualized education program . . . ."); 34 C.F.R. §
300.305(c) ("The public agency must administer such assessments
and other evaluation measures as may be needed to produce the
data [required for formulating an IEP]."); 8 N.Y. Comp. Codes R.
& Regs. § 200.4(b)(5)(iii) ("The school district shall
administer tests and other evaluation materials as may be needed
to produce the data [required for formulating an IEP].").
Indeed, the parties to this litigation do not dispute that the
DOE was "responsible for conducting all necessary evaluations
and reports in connection with planning for [E.D.'s] special
education needs."

Because "a private placement need not provide . . . an IEP
for the disabled student," Frank G., 459 F.3d at 364, Rebecca
had no duty to conduct the tests which underlie a successful
IEP.  Rather, Rebecca's appropriateness as a unilateral
placement is determined by whether Rebecca "provide[d] education
instruction specifically designed to meet the unique needs" of
the student.  Gagliardo, 489 F.3d at 115 (citation omitted).

Indeed, insofar as the CSE elected to utilize and rely upon
the reports and assessments produced by Rebecca during the 2006-
07 school year, the defendants' reliance on such materials

31

weighs in favor, not against, Rebecca's appropriateness.  As
Shatzkin testified at the impartial hearing, the CSE used
Rebecca's reports in formulating the IEP "[b]ecause we felt they
really knew the child well and they were, you know, thorough.
They work with the child regularly, . . . and they submitted
these very detailed reports and we felt they were appropriate."
Indeed, Shatzkin testified at the impartial hearing that
subjective rather than standardized assessment was, in fact, the
most appropriate means of evaluating E.D.:

> [B]ecause of her cognitive delays, her overall
> developmental delays, we didn't feel she could
> participate in formalized testing.  So what we do is
> an alternate -- called an alternate assessment.  And
> that's done more . . . informally with teacher
> observations or reports, class activities and teacher
> made materials.

Further, insofar as Rebecca's reports are laden with caveats --
for example, the Psychological Report's statements that "a
bilingual evaluation may be more appropriate for assessing her
language and verbal development" -- such cautionary observations
augment, rather than detract from, the reports' credibility and
ultimate usefulness.  The plaintiffs may not be denied tuition
reimbursement solely on the basis that Rebecca exercised caution
instead of making unqualified assertions about E.D.'s inherent
or potential abilities.[12]

---

[12]  Indeed, some evidence suggests that the additional insights
to be gained by a bilingual evaluation may have been quite

        2.   Academics

    The second area of evidence that the SRO apparently
considered to be deficient concerned the details of E.D.'s
academic curriculum.  The SRO observed that "[t]he hearing
record does not detail what occurred" during the three math,
three reading, and three writing/academics periods scheduled for
E.D. as part of her weekly curriculum, and the SRO questioned
why so many academic sessions were planned given Friedman's
testimony that, as of September 2007, "[E.D.]'s work was
inconsistent and the student was in need of regulation."  After
enumerating the facts in the record concerning the specific
educational curricula employed with E.D., the SRO noted that
"[n]one of these curricula are described in the record nor is
there a rationale provided for why they were chosen to address
this student's needs."  While the SRO acknowledged Friedman's
testimony that she used "informal observation" and the Brigance
model to "create[] individual plans for students in her class,"
the SRO observed that "neither a copy of the student's
individual plan nor a copy of the student's Brigance results
were entered into the hearing record."

---

modest.  E.D.'s parents wished E.D. to speak English at school;
E.D. herself asserted a strong preference to speak English, not
Spanish, at school; and Spanish-speaking assistants were
regularly available to E.D. and her parents for translation
assistance as needed.

While it is true that the record could have contained a greater degree of detail, the evidence produced by plaintiffs was nevertheless sufficient to satisfy their burden as to the appropriateness of the unilateral placement.[13]  Rebecca's curriculum "follow[s]" or "parallel[s]" the New York State Curriculum Standards, such that Rebecca keeps track of whether "student[s] who [are] working on grade level" are satisfying the relevant state standards.  For "students [who] are not working on grade level," Rebecca "look[s] at what grade level they are working at" and then follows those standards.  Friedman testified that "[w]e create individual plans for the children

---

[13] Defendants cite hearing testimony from Levine, a social worker at Rebecca, for the proposition that Rebecca "[does] not focus on academics until a student [is] 'solid' at all <u>nine</u> levels of DIR."  This conclusion is best placed in context.  The relevant testimony from Levine states:

> DIR believes that until those levels -- those nine levels -- are solid basically 80% of the time, that we won't take the focus away to concentrate on the academics in the same way that another program might. That's not to say that we don't do academics here.  We do, but it focuses a lot on the social and emotional growth and the developmental capacities along those lines.

Later, Levine testified, to similar effect:

> Our main priority is trying to solidify, at least 80% of the time, these developmental levels, which will then lend itself to the student being more available to learn the academics -- to be able to focus, to be able to concentrate, to be able to participate into a [sic] purposeful interactions and conversations, as opposed to rote memorization.

based on informal observations," and that she was "currently
using the Brigance to try and gain a more holistic assessment of
where all of the students are academically and developmentally."
These individual plans are flexible enough to permit day-to-day
alterations if, for example, "a student is very engrossed in an
activity . . . [and] their sensory system or their cognitive
delays aren't inhibiting them from really making the most of
what we're trying to teach them in the moment."  Friedman
testified or stated in written evidentiary submissions that
curricular elements used with E.D., or in E.D.'s classroom, were
Lindamood-Bell "Visualizing [and] Verbalizing", "Everyday Math,"
"Brain Gym," "Hug N Tug," "Thinking Goes to School,"
"Handwriting Without Tears," "News2You" (a curriculum involving
weekly current events), computer typing and games, and a "book
of the week" theme.[14]  Students at Rebecca also have science,

---

[14] McCourt testified more generally:

> [W]e approach academics with wanting anything we do to
> be hands-on experiential.  So we adapt many curric-
> ulums that are standard curriculums like Everyday
> Math.  We use Reading Mastery, Balanced Literacy,
> Lindamood-Bell, Orton-Gillingham, Handwriting Without
> Tears.  We do a hands-on science program called Hands-
> on Science out of New Mexico.  We have social studies.
> We use Hall and Harcourt and then adapt it.  We are
> using Big Math for Little Kids, which is a program out
> of Columbia University.
>
> So we're really taking different curriculums that
> are already out there and then just adapting them to
> our students' needs.

music, drama, and art classes with specialized teachers for
those disciplines.

One of the educational methods that has proven useful for
E.D. has been to frame her academic work around interests that
attract her attention, such as singing and animals.  Friedman
testified that:

> We used our staff and the Floortime model very much to
> bring the academics into the interests that she had.
> And so, for example, [E.D.] was very interested in
> singing about giraffes, and so we would take stories
> that we were reading, or we would take math problems
> that we were trying to work on and incorporate song,
> incorporate animals and pictures of animals into that
> work to make it interesting and extremely pleasurable
> for her.

More generally, Friedman testified that academics at Rebecca are
pursued within a "hands-on experiential" framework providing
"visual supports" and "extra time for reading [and] writing
exercises due to processing issues."  McCourt testified that,
while Rebecca does not give formal grades on academic subjects,
the school gives "progress reports either utilizing clinical
opinion or standardized tests depending on where the child is."

### 3.   Other Evidence of Appropriateness

Other evidence in the record supports a conclusion that
Rebecca was "reasonably calculated to enable the child to
receive educational benefits."  Gagliardo, 489 F.3d at 112
(citation omitted).  Although the IDEA is concerned with the

"educational instruction" of disabled children, the IDEA also
mandates that such instruction be "supported by such services as
are necessary to permit the child 'to benefit' from the
instruction." Rowley, 458 U.S. at 189 (quoting 20 U.S.C. §
1401(26)(A)). Indeed, the Second Circuit has held that, where
"a therapeutic setting" is recommended for a student by
educational experts, a private placement would be inappropriate
under Burlington-Carter if it did not offer a therapeutic
setting to the student. See Gagliardo, 489 F.3d at 113
(reversing a district court that failed to lend deference to the
IHO's finding that the private school "lacked . . . a
therapeutic setting" and therefore "was an inappropriate
placement"). The administrative record amply suggests -- and
the parties do not contest -- that E.D. requires various related
services, including speech therapy and occupational therapy, in
order to benefit from academic instruction.

      As described by McCourt and outlined in documentary
evidence, Rebecca's curriculum embraces a "comprehensive
therapeutic program in a real school environment" including not
only academics, but "occupational therapy, physical therapy,
speech therapy, counseling," and social work. Each student at
Rebecca has a "team" responsible for oversight of the student's
educational and therapeutic program, including the classroom
teacher, teacher assistants, psychologist, occupational

therapist, speech therapist, physical therapist, and social worker.  Each team meets weekly.

Evidence of these related support services was not considered at length by the SRO.  By contrast, the IHO considered this evidence in detail and identified it as supporting her ultimate conclusion that Rebecca was an appropriate placement.  Specifically, the IHO, noting that "[t]he Rebecca School provides [E.D.] with a research based methodology, related services on site in a coordinated program, APE [adaptive physical education], trained staff, and extensive parent training," concluded that "the placement of [E.D.] at the Rebecca School with extended and related services provided by the parents [is] appropriate."  While a court affords "diminished weight" to the IHO's findings when the IHO and SRO disagree, A.C., 553 F.3d at 171 (citation omitted), the IHO's findings remain highly relevant with respect to matters not considered by the SRO on appeal.  See Gagliardo, 489 F.3d at 113-14 (counseling deference to the IHO with respect to issues for which the SRO had not made explicit factual findings).

The evidence available in the record suggests that Rebecca was highly attuned to E.D.'s therapeutic needs, including the ways in which E.D.'s difficulties regulating her senses and behavior inhibited her ability to participate in traditional

forms of classroom learning.  Levine testified that, as of the
end of the 2006-07 school year, E.D.

> was having a lot of difficulty with transitions, and
> there were daily alterations made in her schedule to
> accommodate that, and she needed a lot of support.
> She needed the team to understand that they needed to
> use less language with her -- not to bombard her with
> language.  There were times during the day when she
> actually needed to rest, or just get more physical
> support.  She needed to have a lot of access to a
> sensory gym, or her occupational therapy needs.  She
> has a lot of difficulty with motor planning and
> sequencing, and those are needs that get met in the
> sensory gym and in the classroom.

E.D.'s therapeutic needs are met, in part, through weekly
occupational therapy, weekly speech therapy, adaptive physical
education, and sensory gym time.  More generally, Friedman
testified that Rebecca

> provides many sensory opportunities within the
> classrooms.  And within the school as a whole, they
> have several sensory gyms.  The classrooms and
> teachers are strongly encouraged to offer the students
> constant access to a sensory diet, whether that be
> through massage, use of a trampoline, use of equipment
> in the sensory gym, such as swings, large pillows,
> comfortable access to chairs, squish balls for while
> they're working or trying to attend to stories or
> academics, things that provide them with an
> opportunity to keep their bodies in control so that
> they can simultaneously, or before and after, be able
> to have the greatest access to what the teachers are
> trying to offer them academically and socially.  And
> also, I think a very important component is that the
> children aren't judged for needing that sensory
> integration, that it's looked at as a part of who they
> are and what they need, not a choice they're making to
> misbehave, or something that just needs to be
> redirected.

Levine also explained how Rebecca is attuned to E.D.'s home life and its relationship to E.D.'s classroom needs:

> The parent-teacher communication here is something that's very important to us, and I think it was always very important for the mom and dad to communicate with the teacher, which they did, and it was always translated.  We had a translator to help the teacher understand literally how [E.D.]'s night went, if she had difficulty about sleeping, if she had difficulty in the morning, just in terms of her mood or her eating, that would very often set the tone for the day, and the teacher would be able to modify the daily schedule according to that.

Rebecca also provides other forms of support to E.D.'s family. A social worker is assigned to each family to provide referrals for nutritional, medical, and legal consults; to serve as a liaison between the classroom and the family; and to form part of each child's educational "team" at the school.  Social workers are in weekly contact with each student's parents and provide family training or family counseling as needed.  The parents attend an annual "team meeting" in October and also attend parent-teacher conferences when progress reports are issued.  Teachers send home weekly communications to students' parents, and teachers and social workers occasionally do home visits.

The foregoing evidence is supported by evidence of Rebecca's teacher education and training requirements.  All of Rebecca's classroom teachers are required to either have a master's degree in special education or to possess a bachelor's

degree and be currently enrolled in a master's program.  All
teacher assistants must have a bachelor's degree, and half of
the assistants have either a master's degree or are currently
enrolled in a master's program.  Teachers and teacher assistants
attend regular training at the school; for instance, every
Friday afternoon, Rebecca closes for ongoing staff training,
including a weekly case conference with Dr. Greenspan attended
by all staff and a biweekly Friday training session on rotating
topics that are also open to students' families.  Teachers and
teacher assistants must attend at least one educational
conference every year, and are encouraged to attend two other
conferences relating to DIR and the Floortime model.  Video
cameras in each classroom record a "constant digital media
stream" which is later used for training purposes as well as to
track student progress.  In addition, prior to the start of each
school year in September, Rebecca teachers and staff undergo
four days of intensive training; every six weeks, outside
consultants who specialize in the DIR model or in occupational
therapy conduct hands-on training with staff in the classrooms;
and Rebecca closes for one additional full day of staff
development per year.  Because DIR training is not readily
available in New York State, most Rebecca staff do not enter
employment with prior DIR training, however.

4.   Evidence of Progress

The final category of evidence relevant to the appropriateness inquiry concerns E.D.'s actual progress during the 2007-08 school year.  In determining the appropriateness of a private placement, a court considers whether the placement "is one that is likely to produce progress, not regression." Gagliardo, 489 F.3d at 112 (citation omitted).  To that end, courts must "examine the record for any objective evidence indicating whether the child was likely to make progress or regress under the proposed plan."  Frank G., 459 F.3d at 364 (citation omitted).  Evidence of actual progress is "relevant to the court's review," but by no means dispositive in "demonstrat[ing] that a private placement was appropriate." Gagliardo, 489 F.3d at 115; see also id. ("[E]vidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA." (quoting Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 (6th Cir. 2003))); M.S. ex rel. Simchick v. Fairfax County Sch. Bd., 553 F.3d 315, 327 (4th Cir. 2009) ("[I]n some situations, evidence of actual progress may be relevant to a determination of whether a challenged IEP was reasonably calculated to confer some educational benefit.  To be sure, however, progress, or the lack thereof, while important, is not dispositive." (citation omitted)).  "Objective" evidence

of progress is preferable to "non-objective" evidence.  M.S. ex
rel. S.S. v. Bd. of Educ., 231 F.3d 96, 105 (2d Cir. 2000)
(criticizing the district court for "bas[ing] its findings
primarily on non-objective evidence, such as M.S.'s testimony
that his son had an increased joy of reading and that he was
happier with his friends").

     The record contains ample evidence that E.D. made progress
during the 2007-08 school year at Rebecca.  Although this
evidence is not necessary to the outcome reached herein, it
provides further support for the appropriateness of the private
placement.

     In June 2007, E.D. joined Friedman's classroom.  Friedman
testified that at that time, E.D. "required a very strong amount
of sensory input," needed "many breaks to sensory gym," and
"needed constant pretend play and attention to keep her engaged
and regulated."  She also needed "a lot of visual supports" and
"constant breaks" in order to be able to do academic work.  That
month, Friedman concluded that she could not accurately assess
E.D.'s math or reading abilities because E.D. was "so in need of
regulation that we weren't really able to access her true
knowledge base at that time."  Nevertheless, Friedman estimated
that E.D. was at a DIR level of 2 or 3.

     With respect to E.D.'s progress between the formulation of
the IEP and fall 2007, McCourt testified that "where these

things [i.e., E.D.'s existing deficiencies] are still true,
they're just not as frequent."  McCourt elaborated:

> So she does still have a hypersensitivity to auditory
> stimulus, but she's much more able to hear it.  She
> does not put her hands over her ears as often as she
> used to.  She's able to attend better.  She still does
> require and seek proprioceptive and vestibular input,
> but she's able to be engaged while she's doing it and
> have a back and forth communication.
>     And where she was primarily using gestures, at
> this point she's using more two to three word
> utterances more than just the gestures.  She's able to
> answer more W-H [who, what, where, when, why]
> questions and is definitely paying a lot more
> attention to her peers.

With respect to the 2007-08 school year, McCourt testified that
E.D. "has absolutely been making progress" with respect to "the
use of her language, her ability to participate and attend in
the classroom, her relationships with her peers, her back and
forth communication, [and] her overall ability to be within the
classroom setting and to participate in the activities, it's
huge improvement."  Likewise, Friedman testified that, while at
the start of the 2007-08 school year E.D. was only able to
perform in a classroom setting "in very small spurts," over the
course of the year she "has really blossomed" and has "ma[de]
tremendous strides."  In particular, E.D. has improved her math
skills, such that she is now able to perform double-digit
addition math problems, to do subtraction problems, to work with
money, and to understand basic division concepts such as the
idea of "halves."  With respect to her writing abilities, "she

no longer is completely reliant on one- or two-word answers to
[written] comprehension questions, and we're pushing not only
for [E.D.] to speak in more complete sentences, but also to
write in complete sentences as well."  In terms of her social
behavior, Friedman notes that E.D. "requires less and less . . .
sing-song play"; she is "able to sit and attend, to have staff
work with her"; "[s]he is able to read aloud to the class, she
is able to sit and do addition, and is working on subtraction";
and she "is able to engage in more reality-based back-and-forth
conversations."  With respect to her communication abilities,
E.D. has improved her "ability to communicate . . . in extended
sentences," both in writing and orally; to differentiate between
"pretend play" and normal conversation; and to "sit with other
students" and allow them to interact with her.  She has also
"become much less rigid in her transitions" between activities
and in coping with unexpected changes to daily routines.[15]  In
terms of DIR levels, between September and December 2007, E.D.
moved from functioning "at levels one through three" to
functioning "at levels one through six."  Generally speaking,

---

[15] For example, Friedman testified that "several months ago even,
[if E.D.] expected on a field trip to go on a large school bus
and a small school bus came, it would take maybe 45 minute[s] to
support her in being comfortable enough in that change to get on
the bus."  By later in the 2007-08 school year, however, E.D.
had grown more comfortable with managing such adjustments to her
expectations.

E.D.'s "increased regulation and interest in classroom activities [have] allow[ed] for more participation in academics."

    5.   Conclusion

In sum, the plaintiffs have carried their burden of showing that Rebecca was an appropriate unilateral placement.[16]  Of course, "even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not." Gagliardo, 489 F.3d at 115; see also M.S. ex rel. S.S., 231 F.3d at 105 (reversing a district court that "did not afford

_____

[16] In their briefs, defendants allege that Rebecca is a "private for-profit school" and argue that, because "[f]ederal regulations only permit public funding for parents' unilateral placement of a student at 'a private preschool, elementary school, or secondary school,'" plaintiffs' request for tuition reimbursement should be denied.  This argument was not raised in the administrative proceedings below and therefore is waived. Even if the argument were not waived, however, it would not succeed because the Supreme Court has clarified that the statute cited by defendants -- 20 U.S.C. § 1412(a)(10)(c) -- constitutes a permissive rather than exclusive source of relief authority. See Forest Grove, 129 S. Ct. at 2493.  In Forest Grove, the Supreme Court reaffirmed the general principle that the "IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate."  Forest Grove, 129 S. Ct. at 2496.  It is noteworthy that New York's regulations implementing the IDEA explicitly contemplate placing disabled students in for-profit private schools.  See 8 N.Y. Comp. Codes R. & Regs. § 200.7(a)(2)(d)(2).

appropriate deference" to the SRO's finding that a private
placement was not appropriate).  In this case, however, the
preponderance of the evidence supports a finding that Rebecca
not only possessed desirable amenities, but also that its
educational program for E.D. was "specifically designed to meet
[her] unique needs" and is, therefore, appropriate.[17]  Id.
(citation omitted).  By apparently applying a heightened
standard of proof to plaintiffs' burden on the second prong, the
SRO erred as a matter of law in concluding that Rebecca was not
an appropriate placement.

        B.   Equitable Considerations

        Even if the plaintiffs succeed in showing that their
private placement was appropriate, however, "courts retain
discretion to reduce the amount of a reimbursement award if the
equities so warrant."  Forest Grove, 129 S. Ct. at 2496.
"[E]quitable considerations are relevant in fashioning relief,
and the court enjoys broad discretion in so doing.  Courts
fashioning discretionary equitable relief under IDEA must

---

[17] The SRO has previously found Rebecca to be an appropriate
placement for other autistic students seeking tuition
reimbursement under the IDEA.  See Application of the Dep't of
Educ., Appeal No. 09-001 (March 2, 2009); Application of a Child
with a Disability, Appeal No. 07-105 (December 7, 2007);
Application of a Child with a Disability, Appeal No. 07-038
(July 2, 2007).  The SRO's finding of appropriateness in Appeal
No. 07-038 was upheld on further review before a court of this
District.  See N.R. ex rel. T.R. v. Dep't of Educ., No. 07 Civ.
9648 (BSJ), 2009 WL 874061 (S.D.N.Y. Mar. 31, 2009).

consider all relevant factors, including the appropriate and
reasonable level of reimbursement that should be required."
Carter, 510 U.S. at 16 (citation omitted); see also A.C., 553
F.3d at 171 ("In fashioning relief, equitable considerations
relating to the reasonableness of the action taken by the
parents are relevant." (citation omitted)).  Statutory language
in the IDEA specifically contemplates that a reimbursement award
may be reduced or denied if the parents, inter alia, fail to
timely notify the school district of their intent to enroll
their child in a private school at public expense; fail to make
their child available for an evaluation; or otherwise act
unreasonably.  See 20 U.S.C. § 1412(a)(10)(C)(iii).  In this
case, the IHO concluded that equitable considerations supported
the plaintiffs' claim for relief.  The SRO, having concluded
that Rebecca was an inappropriate placement, did not reach the
issue of equitable considerations.

No evidence in the record supports overturning the IHO's
finding that equitable considerations support the plaintiffs'
claim.  Rather, the record reflects that A.D. and M.D. attended
and participated in the March 5, 2007 CSE meeting in good faith.
Upon receiving the FNR informing them as to the proposed
placement for E.D. at P.S. 94, E.D.'s parents visited the school
to determine whether it would be an appropriate placement for
the 2007-08 school year.  When they concluded that P.S. 94 was

not an appropriate placement, they promptly notified the
defendants of their dissatisfaction by filing an impartial due
process hearing request on June 18, 2007.  Plaintiffs withdrew
their hearing request upon the DOE's representation that the
case would be submitted for settlement, and only re-filed their
request on November 5 after being notified that a settlement
offer would not be forthcoming.  As such, having carried their
burden on the first two prongs of the Burlington-Carter test,
plaintiffs should not be denied tuition reimbursement for the
2007-08 school year on equitable grounds.

### III. Exhaustion of Remedies

Defendants also oppose plaintiffs' claim for reimbursement
for E.D.'s attendance at Rebecca during the months of July and
August 2008 on the grounds that the plaintiffs failed to exhaust
their remedies as to those months.  Defendants claim that the
IEP challenged in the instant litigation was applicable only
through June 2008, and thus, did not pertain to July and August
2008 because those months belong to the following school year.
In New York, the school year is defined by statute as a twelve-
month period beginning on July 1 and ending on June 30 the
following year, see N.Y. Educ. L. § 2(15), and IEPs are
developed on that annual basis.  See N.Y. Educ. L. §
4402(1)(b)(2).  The IHO rejected defendants' argument and

granted tuition reimbursement to plaintiffs for a fourteen-month period, including July and August 2008, because "[o]nce parents unilaterally place a child in a private school, they commit to the full school year as defined by the private school rather than by the Department of Education."  Rebecca's 2007-08 school year ran from September 10, 2007 until August 10, 2008.

Under the IDEA, a plaintiff may only bring suit in federal court once all statutory remedies for challenging an IEP -- including an impartial hearing, and where available, secondary administrative review -- have been exhausted.  See 20 U.S.C. § 1415(*l*).  "Failure to exhaust the [IDEA's] administrative remedies deprives the court of subject matter jurisdiction." Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 245 (2d Cir. 2008).  The exhaustion requirement may be excused, but only "when exhaustion would be futile because the administrative procedures do not provide an adequate remedy."  Id. at 249.

Federal jurisdiction does not exist over plaintiffs' claim for reimbursement as to July and August 2008 because plaintiffs have not demonstrated that they have exhausted their statutory remedies as required by the IDEA, or that such exhaustion would be futile.  The IEP at issue in this case was only applicable for the 2007-08 statutory school year and did not purport to cover July and August 2008.  In order to seek reimbursement for July and August 2008, plaintiffs must file a due process

complaint objecting to the DOE's IEP for the 2008-09 school year
and pursue the administrative review process.[18]   Therefore, the
plaintiffs are not entitled to reimbursement on these facts for
tuition for July and August 2008, which the record reflects
amounted to $12,510.

## IV.  Motion to Strike

The IDEA empowers courts to consider material outside the
administrative record and to hear new evidence.  See 20 U.S.C. §
1415(i)(2)(B)(i)-(iii).   To this end, plaintiffs have submitted
an affirmation by attorney H. Jeffrey Marcus (the "Marcus
Affirmation"); a news article from the Wall Street Journal
entitled "Staying the Course: Schools Beat Back Demands for
Special-Ed Services" (the "WSJ Article"); an attorney
affirmation by Steven L. Goldstein (the "Goldstein
Affirmation"); and an affidavit by Tina McCourt (the "McCourt
Affidavit").   Defendants move to strike the Marcus Affirmation
and the WSJ Article in their entirety, and the Goldstein
Affirmation and McCourt Affidavit in part.

---

[18]  Plaintiffs' reliance on L.M. by H.M. & E.M. v. Evesham
Township Board of Education, 256 F. Supp. 2d 290 (D.N.J. 2003),
is misplaced.  That case concerned not the exhaustion of
remedies, but instead addressed whether plaintiffs could receive
tuition reimbursement where they had unilaterally placed a
disabled student in a religious school that was otherwise
appropriate under the IDEA.

Under Federal Rule of Civil Procedure 56(e), materials submitted by a party in connection with a summary judgment motion must be "made on personal knowledge."  This requirement "is not satisfied by assertions made 'on information and belief,'" SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 138 (2d Cir. 2009) (citation omitted), and "a hearsay affidavit is not a substitute for the personal knowledge of a party." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988).  "A court may therefore strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."  Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999).

The Marcus Affirmation states that it contains the results of a quantitative study conducted by Marcus of SRO decisions from 2006 forward.  After detailing the conclusions from this "statistical breakdown," the Affirmation expresses Marcus's "personal belief that the statistics . . . illustrate a bias" by the SRO and exhorts the Court to deny the SRO the deference to which an SRO decision is ordinarily entitled.  Those portions of the Marcus Affirmation which consist of legal argument and personal opinion will not be considered.

Attached as an exhibit to the Marcus Affirmation is the WSJ Article, which contains various factual allegations and opinions

about the SRO and is apparently offered as support for the
proposition that the SRO is biased.  The WSJ Article constitutes
inadmissible hearsay and is stricken from the record.  <u>See</u>
<u>Student X v. N.Y. City Dep't of Educ.</u>, No. 07 Civ. 2316 (NGG),
2008 WL 4890440, at *4 n.3 (E.D.N.Y. Oct. 30, 2008) (holding
inadmissible the same article in an IDEA case); <u>M.M. ex rel.</u>
<u>A.M. v. N.Y. City Dep't of Educ. Region 9 (Dist. 2)</u>, 583 F.
Supp. 2d 498, 503 (S.D.N.Y. 2008) (same); <u>A.D. et al. v. N.Y.</u>
<u>City Dep't of Educ.</u>, No. 06 Civ. 8306 (BSJ), Dkt. No. 24 at *13
n.6 (S.D.N.Y. Apr. 21, 2008) (same).

　　　　Defendants also partially move to strike, without
describing their objections in detail, the Goldstein Affirmation
and the McCourt Affidavit.  The Goldstein Affirmation serves
primarily to summarize the administrative and procedural history
of the case, but also includes improper argument and statements
of opinion and belief.  The McCourt Affidavit, most of which is
admissible, also contains improper opinion and argument.  To the
extent that the Goldstein Affirmation and the McCourt Affidavit
rely upon hearsay or contain opinion and argument, those
passages will be disregarded.

V.   Attorneys' Fees and Costs

Under the IDEA, attorneys' fees and costs may be awarded "to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i)(I).  Fees awarded under the IDEA "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished," id. § 1415(i)(3)(C), and the fees awarded may be reduced based on a finding that, inter alia, the rates charged or "time spent and legal services furnished were excessive."  Id. § 1415(i)(3)(F).

The plaintiffs' request for attorneys' fees and costs is granted.  An Order accompanying this Opinion shall set a schedule for the plaintiffs' application.

CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment are each granted in part and denied in part.  The defendants' motion to strike the Marcus Affirmation and WSJ Article in their entirety is granted, and the defendants' motion to strike the Goldstein Affirmation and McCourt Affidavit in part is granted. The decision of the State Review Officer is reversed to the extent that it denied tuition reimbursement for July 2007 through June 2008, and affirmed to the extent that it denied

tuition reimbursement for July and August 2008.  The defendants are ordered to pay tuition reimbursement to plaintiffs in the amount of $62,590 reflecting the amount currently owed to Rebecca less the tuition incurred for July and August 2008.  The plaintiffs' request for costs and attorneys' fees is granted.

     SO ORDERED:

Dated:    New York, New York
          February 9, 2010

                                         DENISE COTE
                        United States District Judge